*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 9, 2024

Plaintiff-Appellant,

v

No. 361540
Kent Circuit Court

DAMON ANDREW JACKSON,

LC No. 00-005206-FC

Defendant-Appellee.

Before: M. J. KELLY, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

Defendant, Damon Andrew Jackson, was 17 years old when he committed the offense that resulted in a 2001 conviction of felony murder and a mandatory sentence of life without the possibility of parole (LWOP). Following a second *Miller*[1] hearing in 2022, the trial court resentenced defendant to 420 to 720 months' (35 to 60 years) imprisonment. The prosecution appeals this sentence, arguing that the trial court abused its discretion by finding that defendant's counsel at the first *Miller* hearing was constitutionally ineffective and by concluding that defendant merited a term-of-years sentence. For the reasons herein, we reluctantly affirm defendant's term-of-years sentence.

## I. RELEVANT FACTS AND PROCEEDINGS

In 2012, the United States Supreme Court held that the mitigating characteristics of youth must be considered when sentencing juveniles, and that mandatory sentences of LWOP for juveniles convicted of first-degree murder were unconstitutional. *Miller v Alabama*, 567 US 460, 470; 132 S Ct 2455; 183 L Ed 2d 407 (2012). This holding was made retroactive in 2016. *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 L Ed 2d 599 (2016). Under the system designed by the Michigan Legislature to resentence juvenile lifers, prosecutors are required to file motions for resentencing in all cases in which they intend to ask sentencing courts to affirm a sentence of LWOP. Hearings on these motions are governed by MCL 769.25.

---

[1] *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012).

MCL 769.25a(4)(b). At such hearings, a trial court is required to consider the factors listed in *Miller*, but it may also "consider any other criteria relevant to its decision, including the individual's record while incarcerated." MCL 769.25(6). The factors listed in *Miller* are:

> (1) "[the defendant's] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "the family and home environment that surround[ed] him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) whether "he might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and (5) "the possibility of rehabilitation . . . ." [*People v Skinner*, 502 Mich 89, 114-115; 917 NW2d 292 (2018), quoting *Miller*, 567 US at 477-478 (first and second alterations added; third alteration and ellipsis in *Skinner*).]

The sentencing court is required to "specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed." MCL 769.25(7). The court may either resentence the defendant to LWOP or sentence the defendant to a minimum prison sentence between 25 and 40 years, and a maximum prison sentence of not less than 60 years. MCL 769.25(9).

After a bench trial in 1998, the trial court found defendant guilty, but mentally ill, of first-degree child abuse, MCL 750.136b(2), and first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a), for brutally physically and sexually abusing his one-month-old son. This Court affirmed defendant's convictions of first-degree child abuse and CSC-I. *People v Jackson*, 245 Mich App 17; 627 NW2d 11 (2001). When defendant's son later died from his injuries, a jury convicted defendant of felony murder, and the trial court sentenced him to mandatory LWOP. A panel of this Court affirmed defendant's felony-murder conviction.[2]

After the United States Supreme Court decided *Montgomery*, triggering the procedures described in MCL 769.25a, the prosecution filed notice of its intent to continue to seek a sentence of LWOP. This prompted the first *Miller* hearing. That hearing was held before Kent Circuit Judge Donald Johnston, who had served on that court for almost three decades and presided over both of defendant's trials. After receiving evidence in the form of exhibits and several witnesses (including defendant, character witnesses, and his expert) and considering the written and oral arguments of the parties, Judge Johnston determined that despite his age at the time of the murder (17 days short of 18), defendant should still be sentenced to life in prison without the possibility

---

[2] *People v Jackson*, unpublished per curiam opinion of the Court of Appeals, issued July 31, 2003 (Docket No. 233435).

-2-

of parole. In doing so, Judge Johnston examined each of the relevant statutory and *Miller* factors. With respect to the first factor, Judge Johnston stated:

> The first *Miller* factor is the defendant's chronological age and its hallmark features, among them immaturity, impetuosity, and the failure to appreciate risks and consequences. Well, the defendant in this case was, as has been observed repeatedly, 18 days short of his 18th birthday.

* * *

> In *Miller* there was reference to young boys, I think in the age range of 14, and there was certainly a considerable thought that at that tender age perhaps the imposition of a life sentence without parole was unduly harsh. Here, however, as I said, the defendant is very close to a point where there would have been a firm line drawn and we wouldn't be conducting any of this hearing and none of this would be necessary, and the sentence of life without parole would be unassailable and unquestioned. So it seems to me the chronological features suggest that the defendant is very, very, very close to being held appropriately responsible as an adult for his conduct. I also am inclined to agree with the observations made by Ms. Clifton, that there is not evidence here of impetuosity or failure to appreciate risks and consequences. The defendant certainly acted in a most deliberate and intentional fashion in the commission of these acts and wasn't doing something on the spur of the moment. It was a contrived and carefully considered criminal offense.

As to the second *Miller* factor, Judge Johnston found:

The second *Miller* factor is the family and home environment that surrounds the defendant and from which he cannot usually extricate himself no matter how brutal or dysfunctional. Well, this is interesting, certainly the defendant grew up in a two-parent household, which is usually the hallmark of stability, and yet the family was dysfunctional and abusive in just about every sense of the word. I think Mr. Phelan properly put his finger on on those factors. And indeed the defendant's father, who was gainfully employed, in fact is a prison guard, somewhat ironically, and he was subsequently convicted of criminal sexual conduct on the defendant's sister. So that's pretty severely dysfunctional any way you look at it and probably not the sort of home environment which is likely to produce the best possible outcome in terms of childrearing. On the other hand, it is true that Mr. Jackson, not only could extricate himself from the home environment, he actually did so. He went to live with other people and went to work, and then subsequently returned to the home which was the site of all of these dysfunctional and abusive characteristics. So clearly he could extricate himself from the home and in fact did so, but for whatever reason chose to return, and as Mr. Phelan has observed, I don't know that we can delve too deeply into the reasons for it, but the point is that he was not stuck there and unable to escape, and in fact he did leave it at one point. The other thing that's interesting, and I'm not a clinician and don't want to trespass on that field, is the fact that not everybody wound up in the situation Mr. Jackson found himself in which gave rise to these proceedings. His brother seems to have turned out rather

-3-

well and grew up in the same abusive environment. Why is it that two brothers in the same household environment subject to the same kinds of abuses and dysfunctionality (sic) wind up going such different routes? What causes one to commit an unspeakable criminal act and the other to become a successful, functioning, contributing member of the community? Certainly I don't know, but I think it underscores the point Ms. Clifton was making, that the home environment does not automatically inextricably produce the result of a monstrous criminal act, and in fact people can be productive, law-abiding members of the community and yet have come from a background of that particular scope.

As to the third *Miller* factor, Judge Johnston found:

The third *Miller* factor is the circumstances of the homicide offense, including the extent of the defendant's participation in the conduct and the way familiar familial and peer pressure may have affected him.

Well, the circumstances of the case, as absolutely everybody agrees, are horrendous. Mr. Jackson himself, who I think has been pretty honest in assessing his culpability here, makes no effort to hide from the heinousness of the crime of which he stands convicted.

I will agree, Ms. Clifton, that having been on the bench for nearly 40 years, this is probably the worst case of child abuse I have ever seen, and I've seen a lot of them that have been really pretty bad. But this one, I think, in every respect has to be considered the worst.

\* \* \*

The circumstances are therefore horrific beyond description, and the extent of the defendant's participation is -- is a hundred percent. He's not an aider and abettor or accessory here or even a second degree principal. He is the one and only first degree principal in the case, so his participation was the whole game. And he does not seem to have been affected by any peer pressure to commit the crime. He certainly had various other motivations, primarily sexual in nature, but not to the extent that in any way can mitigate the magnitude of the offense.

Regarding the fourth *Miller* factor, Judge Johnston found that

there is no indication that the defendant would have been charged any differently than he was had he been older and wiser and more mature, for lack of a better way to characterize it. He was not treated differently, nor did he have difficulty navigating the legal system because of incompetencies associated with youth. He seems to have been candid with the police from the outset, and given the magnitude of the offense, he simply wasn't offered a plea bargain.

Finally, as to the last *Miller* factor regarding rehabilitation, the court found:

-4-

Here, I think it has to be said that Mr. Jackson today presents as a much more mature, reflective individual than he did 20-some years ago when the events in question were occurring. I think he's grown up a great deal. The clinical evidence seems to suggest that whatever mental conditions he may have been suffering from previously, he's not suffering from anymore, and indeed there seems to be some indication from the latest clinical assessments that the initial reports by Dr. Miller some years ago were embellished and may have gone beyond the bounds of what the actual facts were. It also appears, as indicated by Ms. Clifton, that the defendant, I think, bought into Dr. Miller's somewhat excessive findings, perhaps in the hopes that that would constitute some form of mitigation.

As to the remaining statutory factors not covered by *Miller*, Judge Johnston found:

The -- I suppose the other factors, which are addressed vaguely in the statute, include the defendant's adjustment to prison life. The defendant has a number of tickets; however, as Mr. Phelan accurately points out, many of them date back to the early days of his incarceration, and, as these things go, they are not generally for particularly serious misconducts. There are a number of them, but they tend to be things like being out of place and disobeying an order or being insolent, things of that sort. And it would seem, both from the testimony of Mr. Jackson and also from Reverend Bell, that he has had a generally positive adjustment to incarceration, and seems to be reflecting appropriately upon his past misdeeds which have put him where he is, and he's taken advantage of whatever opportunities have been presented him to try and improve himself while incarcerated.

After these findings on each of the relevant factors, Judge Johnston's weighing of these findings led to the conclusion that defendant should still be subject to LWOP:

So it's one of these things where we have kind of a split verdict, I suppose. I do think that the *Miller* factors by a substantial majority militate in favor of the mandatory sentence of life imprisonment, or at least they don't mitigate the case to the degree which would call for a term of years sentence. There are factors which are more favorable to the term of years outcome, but there are, I think, more factors which are, again, militating in the opposite direction.

\* \* \*

On balance, it seems to me that the majority of factors and indeed the most important ones militate in favor of the sentence that was originally imposed on Mr. Jackson. It seems to me that if Mr. Jackson continues to make progress in the institutional setting, and I hope he does, that the appropriate recourse is for clemency through the executive branch, and there is a significant machinery in place. I know I've been consulted periodically on cases where executive clemency is being sought by prisoners serving life without parole. I won't be here to deal with it because I'm retiring at the end of the year, but my successor, Judge Denenfeld, will, and I'm sure would take serious any application that might be filed by or on behalf of Mr. Jackson. But my final assessment of the case is that there is not a sufficient basis to deviate from the life in prison without parole sentence

originally imposed by the Court. My conclusion as a matter of fact and law is that a term of years is simply not appropriate to a crime of this magnitude, and based on the analysis which I have undergone in preparation for this hearing and during the course of the hearing, I am satisfied that the previously pronounced sentence of life without parole is appropriate and should be reaffirmed.

In December 2018, Judge Johnston retired. Just months later, defendant, through appellate counsel, moved for a new *Miller* hearing, arguing that defendant's counsel rendered constitutionally ineffective assistance at the first *Miller* hearing. After an evidentiary hearing and the parties' submission of supplemental briefs and exhibits, the successor trial court judge ruled that defendant's counsel at the first *Miller* hearing performed deficiently by "(1) failing to hire a mitigation specialist or an investigator experienced in mitigation, (2) failing to *independently* investigate Defendant's prison records; and (3) making the decision to forgo further investigation to ensure that Judge Johnston presided over the resentencing." The trial court concluded that, but for counsel's deficient performance, there was a reasonable probability that defendant would not have been resentenced to LWOP, and granted defendant's motion for a new *Miller* hearing.

The prosecution sought leave to appeal the trial court's ruling through a delayed application for leave to appeal in this Court. This Court denied the delayed application "for lack of merit in the grounds presented."[3] The prosecution did not move for rehearing or apply for leave to appeal in the Supreme Court.

After the second *Miller* hearing, the trial court came to the opposite conclusion than Judge Johnston. With regard to the first *Miller* factor, the court found that defendant "acted impulsively and irresponsibly throughout his adolescence, and likely did not fully appreciate the full consequences of his offense conduct." The court deemed this factor to tilt slightly away from LWOP. The trial court concluded under the second *Miller* factor that defendant's "shockingly dysfunctional" family and home environment weighed strongly against LWOP. Under the third *Miller* factor, the trial court observed that the appalling circumstances of the homicide offense only weighed slightly in favor of LWOP when considered alone, but noted that in *People v Bennett*, 335 Mich App 409, 426; 966 NW2d 768 (2021), this Court counseled against giving too much weight to the offense conduct. The trial court found that whether defendant would have been charged and convicted of a lesser offense, but for the incompetencies of youth, also weighed slightly in favor of LWOP. Lastly, noting defendant's stellar prison record and the opinion of a qualified expert that defendant had put together decades of excellent behavior, the court concluded that evidence of defendant's rehabilitation weighed significantly against LWOP. On the basis of its analysis, the trial court concluded that a term-of-years sentence was appropriate.

At a subsequent resentencing hearing, the trial court sentenced defendant to 420 to 720 months in prison (35 to 60 years), with credit for 265 months. The prosecution now appeals.

---

[3] *People v Jackson*, unpublished order of the Court of Appeals, entered February 10, 2021 (Docket No. 355845).

## II. LAW OF THE CASE

The prosecution concedes that this Court's denial of its delayed application for leave to appeal the trial court's decision to grant a second *Miller* hearing "for lack of merit in the grounds presented" established the law of the case regarding whether counsel rendered ineffective assistance in the first *Miller* hearing. Nevertheless, the prosecution urges us to revisit the trial court's ineffective-assistance ruling on the basis of the trial court's comment at the beginning of the second *Miller* hearing that the court "just concluded that some things had not been done that *probably* should have been done." The prosecutor contends that this comment added additional information about the trial court's reasoning, demonstrating that the court applied the wrong legal standard by disregarding the presumption that defense counsel rendered effective assistance and by failing to give proper deference to counsel's reasonable strategic decisions. We disagree.

Whether the law-of-the-case doctrine applies is a question of law that we review de novo. *People v Zitka*, 335 Mich App 324, 332; 966 NW2d 786 (2020). The law-of-the-case doctrine provides that once an appellate court has resolved a legal question and remanded the case for further proceedings, the legal question will not be differently determined in subsequent proceedings in the same case in which the facts remain materially the same. See *Grievance Administrator v Lopatin*, 462 Mich 235, 259-260; 612 NW2d 120 (2000). "Two exceptions to the doctrine exist: (1) when the decision would preclude the independent review of constitutional facts and (2) when there has been an intervening change of law." *Webb v Smith*, 224 Mich App 203, 210; 568 NW2d 378 (1997). We have a "mandatory obligation to apply the doctrine when there has been no material change in the facts or intervening change in the law." *Duncan v Michigan*, 300 Mich App 176, 189; 832 NW2d 761 (2013).

The trial judge made the statement at issue at the beginning of the second *Miller* hearing during his informal explanation of the case's procedural history. Nothing about the context suggested that the purpose of the statement was to further justify a ruling clearly explained in a written order handed down more than a year earlier. See *In re Contempt of Henry*, 282 Mich App 656, 678; 765 NW2d 44 (2009) ("[A] court speaks through its written orders and judgments, not through its oral pronouncements."). Under these circumstances, we conclude that the statement at issue does not rise to the level of "additional information" regarding the trial court's decision, and we reject the prosecution's attempt to use an informal comment to advance the same issue already decided by this Court. Because the prosecution has established neither a change in the material facts nor a change in the law since this Court's denial of its delayed application on the ground that it lacked merit, our previous determination of the issue is the law of the case. See *Duncan*, 300 Mich App at 189.

## III. TERM-OF-YEARS SENTENCE

The prosecution next argues that the trial court abused its discretion by resentencing defendant to a term-of-years sentence. We reluctantly disagree.

We review a trial court's decision to resentence a juvenile lifer for an abuse of discretion. See *Skinner*, 502 Mich at 137. "A trial court abuses its discretion when it selects an outcome that was not in the range of reasonable and principled outcomes." *People v Roberts*, 292 Mich App 492, 503; 808 NW2d 290 (2011). The facts underlying the trial court's decision are reviewed for

clear error. *Skinner*, 502 Mich at 137 n 27. Clear error is present when the reviewing court is left with a definite and firm conviction that an error occurred. *People v Fawaz*, 299 Mich App 55, 60; 829 NW2d 259 (2012). A trial court also abuses its discretion when it makes an error of law or "operates within an incorrect legal framework." *People v Everett*, 318 Mich App 511, 516; 889 NW2d 94 (2017). "[A] given sentence can be said to constitute an abuse of discretion if that sentence violates the principle of proportionality, which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990). See also *Graham v Florida*, 560 US 48, 59; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

Recently, in *People v Taylor*, 510 Mich 112; 987 NW2d 132 (2022), the Supreme Court articulated additional procedures and standards to be applied to juvenile LWOP proceedings under MCL 769.25. Specifically, the Supreme Court held that a rebuttable presumption exists against sentencing juveniles to LWOP, and that the prosecution, as the moving party, bears the burden to overcome this presumption by clear and convincing evidence. *Taylor*, 510 Mich at 129. In addition, the Supreme Court explained that the *Miller* factors are not to be used as aggravators; if a particular *Miller* factor does not militate against LWOP, that factor will be considered neutral. *Id*. at 139 n 25. Even if the prosecutor rebuts the presumption, the trial court is not obligated to impose LWOP. *Id*.

The *Miller* proceedings in the present case occurred before *Taylor* was issued. *Taylor* imposes a higher burden on the prosecution and requires the trial court to view the *Miller* factors as either militating or neutral, so it would not impact our review here since the trial court granted a term of years sentence under a more lenient (towards defendant) standard.

Here, although we find Judge Johnston's analysis much more convincing, we simply cannot conclude that the court abused its discretion by resentencing defendant to a term of years. The prosecution first asserts that the trial court's finding that defendant "acted impulsively and irresponsibly throughout his adolescence, and likely did not fully appreciate the full consequences of his offense conduct" was clearly erroneous because it did not account for evidence indicating defendant's maturity at the time of the offense, such as defendant's moving back home and getting a job before his son was born. Although the trial court did not expressly address defendant's moving back home and getting a job in its written opinion, taking the record as a whole, we see no clear error in the trial court's finding that defendant "acted impulsively and irresponsibly throughout his adolescence," including immediately before the offense.

Clinical psychologist Dr. Jeffrey Kieliszewski, who testified at defendant's first *Miller* hearing, and Dr. Michael Caldwell, Psy.D., who submitted a psychological evaluation for defendant's second *Miller* hearing, noted that defendant left his family's home in 1996, but then moved back home before his son was born. Dr. Kieliszewski did not view defendant's moving back home and getting a job as evidence of maturity. To the contrary, Dr. Kieliszewski testified that defendant impulsively switching between trying to do the right thing, i.e., working and supporting his two children, and sliding into a substance-abuse lifestyle, partying, and trying to project a certain persona, were manifestations of defendant's emotional immaturity and impetuosity. Similarly, Dr. Caldwell indicated that, in the month leading up to the offense, defendant "lived in a 'party house' and lived a remarkably irresponsible and immature lifestyle." He was drinking, using marijuana heavily and trying other drugs, not eating or sleeping regularly,

staying up with friends until he passed out, and sleeping no more than four hours a night, and he viewed basic life responsibilities like keeping a regular schedule or holding a job as "burdens that he resented and felt unable to fulfill."

The prosecution further asserts that the trial court's finding under the first *Miller* factor was erroneous because it resulted from the trial court's misinterpretation of evidence regarding defendant's mental status. Specifically, the prosecution asserts that defendant's "concocted claims of blackouts and other symptoms to support his claim of insanity" demonstrated that defendant appreciated the risks and consequences of his criminal behavior. The prosecution contends that defendant faked symptoms of dissociative disorder, then duped Dr. Steven Miller, defendant's expert in forensic clinical psychology at his second trial, into diagnosing him with the condition so that he could avoid the consequences of his actions by pleading insanity.

The trial court rejected this interpretation of events and noted that the theory of dissociative disorder found support in Dr. Caldwell's determination that, at the time of the offense, defendant likely suffered from "mild Dissociative Episodes," including "some mild depersonalization symptoms, in which he experienced his thoughts as external voices." In addition, defendant's sister testified that she had been diagnosed with dissociative disorder when she was 19 years old and had undergone therapy. Without evidence supporting its interpretation of events, we cannot adopt the prosecutor's theory regarding the origins of Dr. Miller's diagnosis of defendant's mental status at the time of the offense.

As to whether defendant "fully appreciate[d] the full consequences of his offense conduct," Dr. Caldwell reported that, although none of the effects of trauma on defendant's neurobiological maturation destined him to commit his offenses or excused his actions, they likely would have "substantially reduced" his capacity to, among other things, "rationally anticipate future consequences, and employ basic conventional problem-solving skills." Further, Dr. Kieliszewski testified that defendant reported that he intended to cause the infant pain and humiliation and to take out his frustrations on the infant, but he never intended to seriously hurt the infant, and he was surprised when the child died. Dr. Caldwell's observation, and defendant's report to Dr. Kieliszewski, if believed, support the conclusion that defendant did not "fully appreciate the full consequences of his offense conduct." While we may disagree with the court's conclusion, as did Judge Johnston after the initial *Miller* hearing, we cannot conclude, from the evidence presented at the second *Miller* hearing and from the trial court's interpretation of that evidence, that the trial court's findings with regard to the first factor were clearly erroneous. In other words, we are not left with a definite and firm conviction that the court erred in its finding that defendant "acted impulsively and irresponsibly throughout his adolescence, and likely did not fully appreciate the full consequences of his offense conduct." See *Fawaz*, 299 Mich App at 60.

The prosecution does not challenge the trial court's assessment of the second *Miller* factor, and the only challenge it raises regarding the remaining factors is to the comparative weight that the trial court gave them. The prosecution asserts that the trial court erred by giving too little weight in its overall analysis to the circumstances of the crime and defendant's ability to assist with his own defense, and too much weight to defendant's rehabilitation. We note that Judge Johnston, just a few months before defendant filed his motion for a second *Miller* hearing, and after presiding over defendant's trials, found the circumstances of the crime to be "horrific beyond description." After the subsequent *Miller* hearing, the trial court also acknowledged the abhorrent

circumstances of the homicide offense, but noted that this Court "counseled against giving too much weight to the offense conduct." See *Bennett*, 335 Mich App at 426. The trial court also indicated that the incompetencies of youth did not affect defendant's interaction with authorities or his ability to assist in his defense, and that this factor weighed in favor of LWOP, but the court gave this factor little weight. Even if we agreed with the prosecution, which we would be inclined to do considering the horrific nature of defendant's offense, the specific weight to be attributed to the factor was within the trial court's discretion.

The record contains evidence of rehabilitation. Richard Stapleton, a highly qualified expert in prisoner disciplinary policies and procedures and department-wide operations followed by the Michigan Department of Corrections (MDOC), submitted a report for defendant's second *Miller* hearing. Stapleton outlined the MDOC disciplinary procedures, including changes to the procedures that occurred during defendant's incarceration; defendant's formal misconduct history; defendant's program and work assignment performance; and defendant's performance on the MDOC's risk-assessment tools. He concluded that defendant's low number of formal misconducts was a "a commendable achievement," and viewed defendant's 14 years at Level II security as "clear evidence of rehabilitation and development of personal responsibility and maturity." Stapleton described how defendant sought means of self-improvement, despite the limited opportunities available to him. He explained that the number and type of jobs that defendant had held was an important achievement, and he observed that the MDOC's risk-assessment tool, COMPAS,[4] found defendant at low risk for violence and for recidivism. Stapleton concluded that defendant had "fully matured in prison" and that, during defendant's two decades of incarceration, "he has never been reported to have exhibited any indications of violent or assaultive behavior. He displays all indications of an individual who could be a responsible and productive member of society."

The record shows that the trial court considered each of the *Miller* factors, specified the aggravating and militating circumstances considered, and explained its reasons supporting the sentence imposed. See MCL 769.25(7). At defendant's sentencing hearing, the trial court observed that the task before it was a "hard call" because defendant had pieced together a "remarkable prison record," but the egregious nature of what happened weighed against "simply imposing the minimum sentence" allowed by law. For this reason, the trial court imposed a term-of-years sentence that required defendant to serve significantly more time before he would be eligible for parole. In light of the trial court's thorough analysis of the *Miller* factors, the record evidence supporting that analysis, and when actually applying[5] the deferential standard of appellate

---

[4] COMPAS is an acronym for Correctional Offender Management Profiling for Alternative Sanction. See Parole Information Project, "COMPAS Risk Assessments," available at <ir.lawnet.fordham.edu/compas/> (accessed May 1, 2024).

[5] But see *People v Granger*, unpublished per curiam opinion of the Court of Appeals, issued August 4, 2022 (Docket No. 355477), where the majority painstakingly examined the record to conclude that the trial court clearly erred in several of its factual findings, and therefore abused its discretion, in re-sentencing the juvenile defendant to LWOP. This was so despite that fact that the trial court issued a 39-page opinion, after a three-day evidentiary hearing, examining all the *Miller*

-10-

review, we cannot conclude that the trial court abused its discretion by resentencing defendant to a term-of-years sentence.

Affirmed.

/s/ Michael J. Kelly
/s/ Kathleen Jansen

---

factors. *Id*. (SAWYER, J., *dissenting*) at 1. De novo review of sentences is not permitted under Michigan law, especially when applying an abuse of discretion standard. See *Skinner*, 502 Mich at 132.